Doxtater vs. Connell and another.

DOXTATER, Respondent, vs. CONNELL and another, Appellants.

*March 31 — April 14, 1896.*

*Deed: Setting aside for fraud: Evidence.*

In an action to set aside a quitclaim deed of fifty-eight acres of land on the ground of fraud by which plaintiff was induced to believe that it conveyed three acres only, it appeared, among other things, that the utmost value of the land was $986; that upon fifty-five acres there were incumbrances amounting to over $600, and the title was just about to be extinguished by a foreclosure sale, against which no provision had been made; that plaintiff's interest was an undivided one-fourth, subject to the dower and homestead rights of her mother, who was but forty-six years old; that defendant had offered $5 for plaintiff's interest in the unincumbered three acres, and plaintiff in reply had offered to sign off *everything* to defendant for $5 and a new dress; that defendant had accepted this offer in a letter stating all the facts, so that if there was any misunderstanding it was due to plaintiff's lack of attention; that the $5 was paid to plaintiff when the deed was executed, and she afterwards received and retained $8 for the purchase of a new dress; and that defendant had made no fraudulent misstatements. *Held*, that the deed should not be set aside.

APPEAL from a judgment of the circuit court for Outagamie county: JOHN GOODLAND, Circuit Judge. *Reversed.*

This is an action in equity to set aside a conveyance of real estate on the ground of fraud. The facts may be stated briefly as follows:

Hira Welsh, a Stockbridge Indian, lived at Stockbridge, Calumet county, Wisconsin, and owned the lands in controversy, which are a part of the Stockbridge reservation, and amount to about fifty-eight acres in all, being composed of three contiguous strips, to wit, a strip of three acres of land in lot 5 of the reservation, also forty-two and one-half acres in lot 54, and twelve and one-half acres in lot 159. Hira Welsh died August 29, 1887, leaving, surviving him, his widow, Janette Welsh, who was then forty-one years of age, and four children, of whom the plaintiff is one. Hira Welsh, in his lifetime, and his wife, executed two mortgages on the lands in question, except the three-acre strip in lot 55, to one Henry Kersten, each being for $150,— one dated December 2, 1885, and the other dated November 5, 1886, and both bearing ten per cent. interest. Both mortgages were duly recorded. Neither of these mortgages was paid, and in 1891 the mortgagee, Kersten, foreclosed the second of said mortgages by action against the widow and all the heirs of Hira Welsh, including the plaintiff, and obtained judgment of foreclosure May 13, 1891; the whole amount of the judgment, including costs, then being $369.91. The plaintiff had married and left home prior to the time of her father's death, and, at the time of the commencement of this action, lived with her husband at Fort Howard, Brown county, on the Oneida reservation. The widow, Janette, continued to live upon the farm after the death of her husband, and lived there at the time of the trial of this action, and is still a widow. Hira Welsh died intestate.

The defendant *Nettie M. Connell* lives at Chilton, Wis., and on the 5th day of February, 1892, through her agent, T. E. Connell, sent the following letter to the plaintiff: "As heir to Hira Welsh, deceased, you own an interest in a small

strip of land in lot 55, Stockbridge, a couple of acres. Now, as I bought the Ann Fisher farm in lot 55, I would like this strip. I looked the matter up and find it will be sold for taxes in May, as the tax was unpaid for the past three years. Now, if you wish to get anything out of it, I will give you $5 for your interest, if you quitclaim to me. Let me know quick, if you are willing to do this. Also let me know if your husband is there with you, and what his full name is, and I will prepare the quitclaim deed and send it to you to be signed." In reply to this letter, the plaintiff, on the 5th day of March, 1892, sent the following letter to the defendant: "I now hasten to answer your letter, as it has lain a long time. I had a letter from my sister in Redwood Falls, informing me of the letter she had from you, telling how you had gave her $5 and the promise of a new dress to us all if we would sign off everything to you, and asking me if I had one; but, as you had directed your letter to Oneida, I had not received it, so my husband chanced to pass the office, and he stopped and inquired there and got your letter. We live so far from there we never have any mail come there. We get our mail at Ft. Howard. So now, if you want my right or my deed in the same way, send me the deed and the money — $5, — and I will sign at once and forward it back to you; and please write my name Matilda, instead of Tillie, for that is not my name. My husband's name is Napoleon Doxtater. Please direct to Ft. Howard if you wish to send the deed. You might as well had it a month ago if you had only sent your letter to Ft. Howard."

Thereupon the defendant, through her agent, sent the following letter to the plaintiff: "Your letter reached me this morning. Yes, I paid your sister the $5, and promised a nice new dress in case I get any benefit of the deed. You know the farm will be sold, I think, in May, by the sheriff, to pay the mortgage. The $5 is for your interest in a small strip from the road east that the mortgage does not cover.

If I can get a deed from your sister Dora and your mother I will be able to take the land and pay off the mortgage and give you each a new dress, as I agreed. If I cannot, or if I have to pay them too much, I will not be able to do this. I think they will deed, as you and your sister have, because they will lose it anyway, and it is better to get a little than nothing. I sent a deed to McCartney's Exchange Bank with the $5. So you can go and sign it as quick as you want to, and get the money. Where are the children of your half-sister, Emma Doxtater, and how old are they? Please let me know. Hope you will hurry up with the deed, for if there is any chance at all to save anything I will have to do it quick."

Upon receipt of the last letter above set forth, the plaintiff went to the bank named in the letter, obtained the $5, and executed the deed, which contained a description of all the lands owned by Hira Welsh in his lifetime, and the deed was forwarded to the defendant. The testimony shows that the land in question was worth from $16 to $17 per acre, and that forty acres of the land was a homestead. The utmost value of the entire farm, therefore, under the testimony, is $986. At the time of the exchange of letters and the execution of the deed above set forth, there were incumbrances upon this land, consisting of the mortgages above set forth, together with a small amount of taxes, amounting to more than $600. The premises were advertised for sale upon the foreclosure on the 6th day of July, 1892, at 11 o'clock A. M. Upon that day the defendant, at 10 o'clock in the forenoon, paid these incumbrances, amounting at that time to $664.26.

The plaintiff claims that she was defrauded in the transaction, in that she was led to believe that she was only deeding the three-acre strip to the defendant, and that she did not intend to deed any other piece of land. She claims that the deed was not read over to her before signing, and that she did not know its contents and did not know that the descrip-

tion of the other parcels of land of which her father died seised were contained in the deed. All allegations of fraud are denied by the defendant. It appears that, on the 7th of July, 1892, the defendant forwarded to the plaintiff a draft for $8 for the purchase of a dress, which draft the plaintiff received and collected. The plaintiff can read and write English, was twenty-seven years of age at the time of the trial, and lived on the land in suit from the time of her birth until she was eighteen years of age.

At the close of the trial the court made findings to the effect that plaintiff was unacquainted with the transaction of business, and not familiar with the property mentioned in the complaint, and did not know the value thereof or her interest therein; that in February, 1892, she owned a one-fourth interest in the lands described in the complaint, and that said lands were reasonably worth $1,750, and were subject to the lien of the foreclosure judgment above referred to, and that parts of lots 54 and 159 were subject to tax liens; that the defendant drafted a deed covering the plaintiff's entire interest in said premises, and procured the plaintiff to execute the same under the belief that she was conveying only the three acres in lot 55, and no other lands; that the only consideration therefor was $5, which was wholly inadequate; that the plaintiff was induced to execute said deed by reason of statements in the letter of February 5, 1892, said letter being the same letter heretofore set out in full; that the statements contained in said letter were false, but that the plaintiff relied upon them, and believed them true, and was induced to execute the deed on the strength of such belief, and that she would not have conveyed the premises had she known the true condition of her title, and the value thereof, and what was in fact covered by the deed; that the defendant, on July 6, 1892, redeemed the premises from the judgment of foreclosure, paying therefor, in all, the sum of $433.57, and the further sum of $11.69 to redeem them from the tax sale of May, 1891.

As conclusions of law, the court found that the deed ought to be annulled, canceled, and set aside for fraud; that the defendant ought to be reimbursed by the plaintiff for one fourth of the amount paid in removing incumbrances or liens from the premises, to wit, one fourth of $433.57 and one fourth of $11.69, with interest from July 6, 1892; also, that she should be reimbursed the $5 and the $8 paid by drafts; that plaintiff should also recover her costs, which should be offset in discharge of the amount which the court holds should be reimbursed to the defendant; that the amount directed to be reimbursed to the defendant should be secured by lien upon the premises. Judgment was entered accordingly, and the defendants appeal.

For the appellants there was a brief signed by *James Kirwan*, attorney, and *Humphrey Pierce*, of counsel, and a brief in reply and oral argument by *Mr. Pierce*.

For the respondent there was a brief by *J. E. McMullen*, and oral argument by *J. A. Aylward*.

Winslow, J. We are unable to agree with the conclusion of the circuit judge to the effect that there was fraud in the transaction under investigation. The material facts are quite free from dispute. The land in dispute was worth, according to the highest estimate, not more than $17 per acre, or, in all, $986 for the fifty-eight acres. In February, 1892, when the negotiations were begun, the whole farm, except the three-acre strip in lot 55, was incumbered by a foreclosure judgment, rendered May 13, 1891, for $369.91, with accrued interest; also, by another mortgage, on which was due more than $200, and with a small amount of unpaid taxes. Besides these incumbrances, forty acres of it was a homestead, and subject to the estate, during widowhood, of the widow of Hira Welsh, who was then but forty-six years of age and still unmarried; the balance being subject to the widow's dower interest. Subject to these incumbrances and burdens, the plaintiff owned an undivided one-fourth

interest. Neither she nor any of the other heirs appear to
have had any thought, ability, or intention of redeeming the
land from the foreclosure sale, which would take place, in
the natural order of things, early in July, 1892. The plaint-
iff knew her father left a farm, though she denies that she
knew its value or the number of acres. She had lived on
the farm up to her eighteenth year. This was the situation
when the defendant offered her, by letter, $5 for the three-
acre strip. There was no material false statement in this
letter. It is true that the taxes were not unpaid for three
years on it, but they were unpaid for 1891, and it was sold
for taxes in May, 1892. There was no statement of value,
nor was there any misstatement of a material fact, nor was
the price offered inadequate, in consideration of the situation
of the property. To this letter the plaintiff replied, offering
to sign off *everything* for $5 and a new dress. In view of
all the facts and the knowledge which the plaintiff had,
this offer can mean nothing less than a proposition to quit-
claim her interest in the entire farm. The defendant so
understood it, and replied immediately, accepting the new
proposal. In this letter she informs plaintiff specifically that
the *farm* will probably be sold in May to pay the mortgage;
that the $5 which she sends is to pay for her interest *in the
small strip* which the mortgage does not cover. She then
discusses the question whether she can pay off the mortgage
and give each of the heirs a new dress if all the heirs will
deed as "*you and your sister*" have done, and informs her
that the deed is sent to the bank, where she can execute it.
This letter certainly, if carefully read, reveals the entire
facts; and, if misunderstood, it cannot reasonably be con-
sidered as the fault of the defendant, but rather due to
lack of attention on the part of the plaintiff. From it the
plaintiff was informed that she was receiving $5 for the strip,
and that the defendant was offering the dress for her inter-
est in the balance of the farm, which was mortgaged and

soon to be sold. In addition to this, the deed disclosed the fact that the whole farm was desired by the defendant, and in July following the plaintiff received from the defendant a draft for $8 for her interest in the farm, which she has kept. Considering the fact that the plaintiff's interest in the farm was subject to life estates and incumbrances just ready to extinguish the original title, which neither she nor the other heirs had made any preparations to meet, and the further fact that there appear to have been no fraudulent misstatements made by the defendant, the deed must stand.

*By the Court.*— Judgment reversed, and action remanded with directions to enter judgment dismissing the complaint.